**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JEFFREY JONES, BRIAN MILNE, PATRICK JOHNSON, RANDALL SCOTT, EDWARD WILKINS III, and JOHN HARRIS II, individually and on behalf of all similarly situated individuals, | Case No. |
| *Plaintiff,* | |
| *v.* | |
| BRG SPORTS, INC., a Delaware corporation, | |
| *Defendant.* | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Jeffrey Jones, Brian Milne, Patrick Johnson, Randall Scott, Edward Wilkins III, and John Harris II, individually and on behalf of all others similarly situated, bring this Class Action Complaint and Demand for Jury Trial against Defendant BRG Sports, Inc.—commonly known, in part, as Riddell—for its practice of marketing, promoting, and distributing dangerous and defective football helmets. Plaintiffs, for their Complaint, allege as follows upon their personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

### NATURE OF THE ACTION

1.      Riddell is the world's largest football helmet manufacturer. For decades, Riddell has designed and distributed helmets for high school and college football programs throughout the United States.

2.      As a leading helmet manufacturer, Riddell recognizes that football's evolution

over the years can only be described as getting "BIGGER, FASTER, STRONGER."[1] Indeed, this evolution has increased the level of violence on the field and resulted in more player injuries, including concussions.

3.     Yet, throughout Riddell's history, the company has marketed and advertised their helmets as "safe" for the game of football. Over time, this marketing strategy made Riddell's brand synonymous with football safety. In 1989, Riddell's notoriety reached new heights when it signed an exclusivity agreement with the NFL.

4.     But Riddell's safety representations were hollow. Not only did Riddell fail to keep up with new technological developments—such as by employing ineffective, substandard materials in its helmets' liners—it fundamentally ignored the dangers of head injuries in football and misrepresented the ability of their helmets to prevent them or reduce them.

5.     Prior to 1983, Riddell failed to provide *any* warning labels informing its customers of the dangers of playing football. Beginning in 1983 through the late 1990s, Riddell's helmets bore only a very small, vague warning that did not disclose the long-term dangers that football players would be exposed to while wearing Riddell helmets and using them for their intended purpose. Worse yet, in the early 2000s Riddell sought to profit from renewed attention to concussions in football, promoting a new helmet by affirmatively promising to "reduce the incidence of concussions." In reality, Riddell's helmets could hardly do this at all.

6.     This conduct was to the detriment of tens of thousands of student-athletes who played college football while wearing Riddell helmets, including Plaintiffs. The maladies they now suffer—ranging from motor impairment and depression to dementia—were the direct and

---

[1]     *About Riddell - From M1 Helmet to Modern Football Helmets*, https://www.riddell.com/history (last visited Aug. 23, 2018).

proximate result of taking repeated blows to the head during their high school and/or college football careers, under the Riddell-induced belief that their helmets would keep them safe.

7.     For decades, Riddell knew the representations it was making to players were false and misleading, and failed to take effective action to protect and inform Plaintiffs and the Classes (defined below) of the true risks and dangers associated with concussions, brain injuries, and repetitive brain trauma—all which were or should have been known by Riddell. Further, Riddell failed to improve the design of its dangerous helmets or admit that such design was defective; failed to provide adequate warnings; and enriched itself at Plaintiffs' and the Classes' expense.

8.     As a result of Defendant's acts and omissions, Plaintiffs and hundreds of thousands former football players suffered brain and other neurocognitive injuries from playing football while wearing defective Riddell helmets. As such, Plaintiffs bring this Class Action Complaint to vindicate their rights and hold Riddell accountable for its conduct.

**PARTIES**

9.     Plaintiff Jeffrey Jones is a natural person and citizen of the State of Michigan.

10.    Plaintiff Brian Milne is a natural person and citizen of the State of Ohio.

11.    Plaintiff Patrick Johnson is a natural person and a citizen of the State of Kentucky.

12.    Plaintiff Randall Scott is a natural person and a citizen of the State of Texas.

13.    Plaintiff Edward Wilkins III is a natural person and a citizen of the State of Mississippi.

14.    Plaintiff John Harris II is a natural person and a citizen of the State of Texas.

15.    Defendant BRG Sports, Inc., formerly known as Riddell Sports Group, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business

located at 9801 West Higgins Road, Suite 800, Rosemont, Illinois 60018. BRG Sports, Inc. does

business in this District, in the State of Illinois, and throughout the United States.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this case under 28 U.S.C.

§1332(d)(2) because (a) at least one member of the Classes, which consists of at least 100

members, is a citizen of a state different from Defendant, (b) the amount in controversy exceeds

$5,000,000, exclusive of interest and costs, and (c) none of exceptions under that subsection

apply to this action.

17.    This Court has personal jurisdiction over Defendant because its principal place of

business is located in this District, it conducts significant business in this District, including

establishing consumer and business contracts here, and because the unlawful conduct alleged in

the Complaint occurred in, was directed at, and/or emanated from this District.

18.    Venue is proper in this District pursuant to 28 U.S.C. §1391 because Defendant

resides in this District.

## FACTUAL BACKGROUND

**I.    The History of Riddell.**

19.    For decades, Riddell has been the leading seller of football helmets for high

school and college football players throughout the United States. Riddell claims they are "the

premier designer and developer of protective sports equipment."

20.    Founded in 1929, Riddell has long held itself out as a company dedicated to the

"protection" of its customers. Riddell claims that its 1939 entry into football helmet

manufacturing was a "wipe-the-slate-clean, make-a-difference moment" in helmet technology.

21.    Since at least 1973, Riddell has continuously represented itself as a market leader

4

and formed significant partnerships with a number of organizations to promote player education

and safety including USA Football, American Youth Football, the NFL, the NFL Players

Association, the Collegiate and National Athletic Trainers' Association, and the Canadian

Football League. Part of Riddell's partnership with the NFL included an exclusivity contract in

1989 that would assure its helmets were seen on television by millions of people.

22.     When Riddell developed the first football helmet, it sought to solve a prevalent

problem: football players cracking their skulls. Instead of the traditional leather elements worn in

the early 1900s, Riddell utilized a plastic shell and a foam liner to absorb and dissipate impacts

to the head. While this new helmet design—and many of Riddell's subsequent designs—

prevented this obvious problem, it did not solve a more widespread and systematic injury facing

all football players.

23.     Violent and repetitive blows to football players' heads lead to concussions and

other traumatic brain injuries ("TBIs"). And, as described below, concussions, repeated sub-

concussive blows, and TBIs often lead to a wide variety of long-term health problems. Scientific

studies have firmly established that players who sustain repetitive concussions face the risks of

long-term brain injuries. Both dangers of concussions, and the inability of Defendant's helmets

to prevent them, have long been known to Riddell, or should have been known.

24.     Still, Riddell built its brand on public statements that its helmets were "safe" for

normal football use, even though it knew its helmets could not prevent concussions, even going

so far as to advertise that its Revolution helmets would reduce concussions by over 30%. Making

matters worse, Riddell constructed its helmets in a way that made them far less effective at

absorbing energy from impacts to the head.

**II.     Decades of Studies Firmly Establish the Dangers Associated with Football-Related
Head Injuries.**

25.     Throughout the twentieth century and into the twenty-first century, studies have firmly established that repetitive and violent impacts to the head can cause concussions and TBIs, with a heightened risk of long-term injuries and impacts, including—but not limited to—memory loss, dementia, depression, Alzheimer's disease, Parkinson's disease, and chronic traumatic encephalopathy ("CTE").

26.     Such violent impacts to the head are a one-way street for those who experience them. As Jonathan J. Russin—Assistant Surgical Director at the USC Neurorestoration Center at the Keck School of Medicine—has stated, "there's no way to undo a traumatic brain injury," and one's "best bet is to avoid concussions altogether."[2]

27.     To better understand the results of these studies, a brief introduction to concussions in football follows.

###     A.     An Overview of Concussions in Football.

28.     A TBI is an injury to the brain that comes as the result of the application of either external physical force or rapid acceleration and deceleration forces, which disrupts brain function in a manner that causes impairments in cognitive and/or physical function.

29.     A concussion is a TBI initiated by an impact to the head, which causes the head and brain to move rapidly back and forth. The movement causes the brain to bounce around or twist within the skull, damaging brain cells and leading to harmful chemical changes in the brain.

30.     The human brain is made of soft tissue, cushioned by spinal fluid, and encased in a hard skull. During everyday activity, the spinal fluid protects the brain from crashing against the skull. But relatively minor impacts—including not only direct blows to the head, but also

---

[2]     Deanna Pai, *Do Concussions Increase the Risk of Stroke or Brain Cancer?*, Keck School of Medicine at USC, https://bit.ly/2MzSkkC (last visited Sept. 18, 2018).

blows to the body and movements that cause the neck to whiplash—can move the brain enough to press through the spinal fluid, knock against the inside of the skull, and cause concussions.

31.     Concussions typically occur when linear and rotational accelerations impact the brain, through either direct impact to the head or indirect impacts that whiplash the head. During the course of a college football season, studies have shown that athletes can receive more than 1,000 impacts greater than 10 Gs (or gravitational) force. This is slightly more force than a fighter pilot receives from performing maximal maneuvers. The majority of football-related hits to the head exceed 20 Gs, with some going well over 100 Gs.

32.     Kevin Guskiewicz, of the University of North Carolina's Sports Concussion Research Program, compared the impacts sustained in a routine college football practice to crashing a car: "If you drove your car into a wall at twenty-five miles per hour and you weren't wearing your seat belt, the force of your head hitting the windshield would be around 100 [Gs]: in effect, the player [who sustained two hits above 80 Gs] had two car accidents that morning."[3]

33.     When a student-athlete suffers a severe impact to the head, they may start experiencing concussion-related symptoms, including:

- "seeing stars" and feeling dazed, dizzy, or lightheaded;

- memory loss;

- nausea or vomiting;

- headaches;

- blurred vision and sensitivity to light;

- slurred or incoherent speech;

- difficulty concentrating, thinking, or making decisions;

---

[3]     Malcolm Gladwell, Offensive Play, *The New Yorker* (October 19, 2009)
http://www.newyorker.com/magazine/2009/10/19/offensive-play (last visited Oct. 30, 2018).

- difficulty with coordination or balance;

- feeling anxious or irritable for no apparent reason; and/or

- feeling overly tired.

34.     The length of the healing process varies from person to person and from concussion to concussion. Symptoms may even last for one or two weeks.

35.     Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. The symptoms of post-concussion syndrome can last for months or sometimes even be permanent. Generally, people suffering from post-concussion syndrome are referred to specialists for additional medical help.

36.     Many people think of concussions as short-term, temporary injuries. But scientific research demonstrates that the effects of concussions are anything but temporary.

**B.      *Numerous Studies Confirm the Dangers and Long-Term Effects of Concussions and Other Head Injuries.***

37.     Medical science has long recognized the debilitating effects of concussions and other TBIs, connected it to contact sports more broadly (including football), and found that that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

38.     The Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute conducted the two leading studies of the long-term effects of concussions. These studies showed the "devastating consequences" of repeated concussions, including that they lead to an increased risk of depression, dementia, and suicide. These studies have also demonstrated that repeated concussions trigger progressive degeneration of the brain tissue, including the build-up of an abnormal protein called the tau protein.

39.     Between 2002 and 2007, Dr. Bennett Omalu of the Brain Injury Research Institute examined the brains of five former NFL players: Andre Waters, Mike Webster, Terry Long, Justin Strzelczyk, and Damien Nash. Waters killed himself; Nash died unexpectedly at the age of 24; Webster, homeless and cognitively impaired, died of heart failure; and Strzelczyk died driving the wrong way down a highway at 90 miles per hour. Four of the five brains showed the telltale characteristics of CTE—a progressive, degenerative disease of the brain found in people with a history of repetitive brain trauma.

40.     In his early studies, Dr. Robert Cantu of the Boston University Center for the Study of Traumatic Encephalopathy found evidence of CTE in 90 of 94 (96%) autopsied brains of former NFL players. A recent update to these studies found CTE in a staggering 110 of 111 (99%) former NFL players and 48 of 53 former college players (91%).[4]

41.     Dr. Omalu now believes that more than 90% of former NFL players suffer from CTE.

42.     These studies were neither aberrations nor surprises, but confirmations of what was already known or readily apparent from the existing medical literature. Studies like Drs. Cantu's and Omalu's—which establish the devastating dangers related to TBIs—date back to the early twentieth century.

43.     For instance, in an article in the 1905 multi-volume medical text *A System of Medicine*, surgeon Sir William Bennett noted that the dangers from TBIs can arise just as easily when "no loss of consciousness occurs at all," and that such injuries "may in the end have far graver results" due to their "escap[ing] treatment altogether in the first instance" given their less

---

[4]     Jesse Mez, MD, MS, et al., *Clinicopathological Evaluation of Chronic Traumatic Encephalopathy in Players of American Football*, 318 JAMA 4, 360–370 (2017).

severe appearance.[5] Bennett noted that the imposition of a strict treatment regimen immediately after an injury, during initial recovery, and following the initial recovery period, was essential to the "treatment of all cases of concussion of the brain, whether they be severe or slight."

44. Some early articles from this period began to recognize the unique dangers presented by football, specifically. The editors of the *Journal of the American Medical Association* recognized the long-term risks of such head injuries very early on, writing in 1905 that "[t]o be a cripple or lunatic for life is paying high for athletic emulation" via football.[6] Similarly, the risks of concussion in football were discussed in a 1906 article by Dr. Edward Nichols, who observed that a concussed player might go through multiple plays before his teammates noticed his altered mental state.[7]

45. Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science began to clearly recognize the debilitating effects of concussions and other TBIs. In 1927, Drs. Michael Osnato and Vincent Giliberti discussed a disease they called traumatic encephalitis in an article on post-concussion damage in *Archives of Neurology & Psychiatry*, concluding that brain disease could manifest in "young men knocked out in football and other games," but noting that the issue had "not received adequate attention."[8]

46. Then, in 1928, Pathologist Dr. Harrison Martland published a study called "Punch Drunk" in the *Journal of the American Medical Association*, where he described the clinical

---

[5]     Sir William Bennett, *Some Milder Forms of Concussion of the Brain*, A System of Medicine Vol. 8 231-32 (2d ed. 1910).

[6]     Editors, *The Football Mortality*, 39 JAMA 1464 (1905).

[7]     Edward Nichols, *The Physical Aspect of American Football*, 154 Boston Med. & Surgical J.1 (1906).

[8]     Michael Osnato & Vincent Giliberti, *Postconcussion Neurosis-Traumatic Encephalitis*, 18 Archives of Neurology & Psychiatry 181 (1927).

spectrum of abnormalities found in nearly 50 percent of boxers who had been knocked out or who had suffered a considerable impact to the head.[9]

47. Numerous studies were later conducted on boxers suffering chronic neurological symptoms as a result of repeated head injuries, and who displayed signs of dementia and impairment of motor functions.[10] As incidents of chronic encephalopathy increased, they were often characterized as a "Parkinsonian" pattern of progressive decline. However, in a chapter of a mid-twentieth century book on brain injuries, psychiatrists Karl M. Bowman and Abram Blau coined the term "chronic traumatic encephalopathy" to explain the deterioration of a boxer's mental state over time.[11]

48. In 1936, Dr. Edward J. Carroll, Jr. wrote an article further recognizing "punch-drunk syndrome's" seriousness, stating that "no head blow is taken with impunity, and [] each knock-out causes definite and irreparable damage. If such trauma is repeated for a long enough period, it is inevitable that nerve cell insufficiency will develop ultimately, and the individual will become punch-drunk." He also noted that in addition to boxers, punch-drunk syndrome had been observed in football players.[12]

---

[9]     Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

[10]     *See, e.g.*, E. Guttmann & C.E. Winterstein, Disturbances of Consciousness After Head Injuries: Observations on Boxers, 84 J. of Mental Sci. 347 (Mar. 1938); Harry L. Parker, Traumatic Encephalopathy ('Punch Drunk') of Professional Pugilists, 15 J. of Neurology & Psychopathology 20 (July 1934); C.E. Winterstein, Head Injuries Attributable to Boxing, 2 Lancet 719 (Sept. 1937).

[11]     K.M. Bowman & A. Blau, *Psychotic States Following Head and Brain Injury in Adults and Children*, in Injuries of the Skull, Brain and Spinal Cord: Neuropsychiatric, Surgical, and Medico-Legal Aspects 309 (S. Brock, ed. 1940).

[12]     Edward J. Carroll, Jr., *Punch-Drunk*, 191 Am. J. Med. Sci. 706 (1936).

49.     The next year, the American Football Coaches Association published a report warning that players who suffer even "one concussion" should be removed from play.[13]

50.     In 1952, an article published in *The New England Journal of Medicine* first recommended a "three-strike rule" for concussions in football, demanding that players cease to play football permanently after receiving their third concussion.[14]

51.     Starting in the late 1960's, the medical community began focusing more on the effects of concussion-related injuries in football. In a 1967 study, Drs. John R. Hughes and D. Eugene Hendrix examined how severe impacts affected brain activity in football players by utilizing electroencephalograms ("EEGs").[15] Several years after that, a potentially fatal condition known as "Second Impact Syndrome" was identified, which is a re-injury to an already-concussed brain that triggers swelling the skull cannot accommodate.

52.     In 1975, the Chief Medical Officer of the British Boxing Board of Control suggested boxers were not the only persons or athletes vulnerable to the risk of long-term brain injuries, stating:

> Irreversible brain damage caused by regular excessive punching can cause a boxer to become punch drunk, a condition known euphemistically in medical terms as Traumatic Encephalopathy. The condition can be caused by other hazards of contact sports—taking too many falls while hunting or steep chasing or the continual use of brute force rather than skill in the rugby field or heading a football incessantly over many years. **Anything which**

---

[13]     Proceedings of the Seventeenth Annual Meeting of the American Football Coaches Association (Dec. 29, 1937) ("Sports demanding personal contact should be eliminated after an individual has suffered a concussion").

[14]     Augustus Thorndike, Serious Recurrent Injuries of Athletes—Contraindications to Further Competitive Participation, 247 New Eng. J. Med. 554, 555-56 (1952).

[15]     John R. Hughes & D. Eugene Hendrix, *Telemetered EEG From A Football Player In Action*, 24 Electroencephalography & Clin. Neurophysiology 183 (1968).

entails intermittent trauma to the head can cause it.[16]

53.    Overall, study after study published in prominent medical journals such as the

*Journal of the American Medical Association*, *Neurology*, *The New England Journal of*

*Medicine*, and *The Lancet* have warned of the dangers of single concussions, multiple

concussions, and/or football-related head trauma from multiple concussions and repeated sub-

concussive blows to the head. These studies collectively established that:

- repetitive head trauma in contact sports, including football, has potential dangerous long-term effects on brain function;

- encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;

- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of brain cells in the brainstem;

- immediate retrograde memory issues occur following concussions; and,

- even minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brain stem evoked potentials and reduced speed of information processing.

54.    Riddell, like others in the industry, knew for decades about the deleterious effects

of concussive and repetitive sub-concussive blows on student-athletes, including (but not limited

to) from various peer-reviewed scientific studies, neuropathology studies, its own research, and

its institutional knowledge. Riddell even contributed to the wealth of knowledge on this topic

when it studied the biomechanics of head movement in relation to the development and

marketing of its products.

55.    As a football helmet manufacturer designing products focused on player safety,

---

[16]    J.W. Graham, Eight, Nine, Out! Fifty Years as Boxer's Doctor, 56 (1975).

Riddell assumed a duty to adequately inform and warn football players of the risks associated with concussions and repeated sub-concussive hits while wearing Riddell helmets, and to design helmets to adequately protect against those risks. Players—including Plaintiffs and the Classes—and their families thus relied on Riddell to disclose important risk information; design helmets that adequately protected against such risks; and adequately protect player health and safety overall through instructions, warnings, and directions for proper use of its products. Riddell failed to do any of these things.

### III.     Riddell's Helmets Do Not Prevent or Meaningfully Reduce Concussions, Despite Claiming Otherwise.

56.     Early football helmets consisted of nothing more than leather padding. The first football helmet in the 1920s was constructed entirely of soft moleskin leather, though subsequent designs in the 1930s and the 1940s adopted a harder leather design. These early helmets were introduced to stop catastrophic on-field injuries plaguing football in the early 1900s.

57.     John T. Riddell, the founder of Riddell, first developed the plastic helmet in 1939. Riddell's invention went on to become the RT2 helmet that ignited an evolution of the sport.[17]

58.     Over the next three decades, all football helmets switched from a leather design to a plastic design that included internal padding.[18] The 1970s brought additional new technology to football helmets. Manufacturers began making energy-absorbing helmets, and by the early 1980s all football helmets were made of polycarbonate materials.[19]

---

[17]     *About Riddell - From M1 Helmet to Modern Football Helmets*, https://www.riddell.com/history (last visited Aug. 23, 2018).

[18]     *History of the NFL football helmet - NFL.com*, http://www.nfl.com/news/story/0ap1000000095139/article/history-of-the-nfl-football-helmet. (last visited Aug. 23, 2018).

[19]     *Id.*

14

59.     Modern football helmets' basic design elements include the use of a hard plastic polycarbonate exterior shell (the "shell") that absorbs the force of collision, as well as an internal system of shock-absorbing pads and foams (commonly referred to as the "liner").

60.     The purpose of the shell is to provide a smooth, hard outer surface which resists penetration, and is designed to distribute the impact load onto a large area. The shell reduces the force transmitted to the liner and the head, assuming that it can effectively spread a localized impact load over a large segment of the shell.

61.     The purpose of the shock-absorbing liner, positioned on the inside of the helmet, is to diffuse the force being transmitted through the shell. As the second line of defense, the liner provides absorption in order to manage the force transmitted to a player's head and neck. The energy of the impact is absorbed as the material in the liner system compresses. The right choice for shock absorbing liner is a critical one, as it absorbs the force of impacts by deforming in a controlled fashion.

62.     Notably, organized athletic sports on the collegiate level enjoyed an unmatched rise in popularity starting in the 1960s—the same time football helmet technology improved and football players were transitioning to plastic helmets with internal padding. Football brought in large crowds, increased media attention, and ever-greater opportunities for profit.

63.     Under this newfound spotlight, and with growing confidence in their protective gear, motivated athletes began to play the game more aggressively. As a direct consequence, the game saw a consistent rise in concussions—as well as significant, repeated sub-concussive blows to the head—that the helmets could not prevent or adequately protect against.[20]

### A.     The NOCSAE Self-Certification Test.

---

[20]     *History – NOCSAE,* https://nocsae.org/about-nocsae/history/ (last visited Aug. 23, 2018).

64.     Despite the introduction of polycarbonate helmets to the game of football, the incidence of head injuries continued to increase, prompting the formation of the National Operating Committee on Standards for Athletic Equipment ("NOCSAE") in 1969 to initiate research efforts for head protection. NOCSAE would implement the first football helmet safety standards in 1973.

65.     NOCSAE is funded with licensing fees collected from helmet companies, and its board of directors is drawn from both industry representatives and sports medicine experts. However, NOCSAE does not itself conduct product certification—rather, manufacturers like Riddell assume the responsibility of self-certification.[21]

66.     NOCSAE rates helmets numerically on a "Severity Index" or "SI" score. The SI scores reflect how well helmets absorb the energy from an impact by measuring the effects on the head, **but are not an indicator of a helmet's ability to prevent concussions**. The higher the score, the more damaging the effects. In order to obtain the NOCSAE certification seal, helmets are tested on a pass/fail standard. To pass, helmets must score below 1200 SI at all impacts. Today, all adult helmets that pass the NOCSAE certification score vastly below the 1200 SI threshold.

67.     The current testing standard involves mounting a football helmet on a synthetic head model and dropping it a total of 16 times onto a firm rubber pad, including two drops apiece from a height of 60 inches onto six locations at ambient temperatures. Two 60-inch drops are also conducted immediately after exposure of the helmet to 120 degrees Fahrenheit temperatures for four hours.

68.     The NOCSAE standard was developed to reduce the incidence of serious injuries

---

[21]     *Id*.

16

like skull fractures and cervical spine injuries. However, these test methods *were not* explicitly developed with the goal of reducing concussions and/or traumatic brain injuries, and were not developed with the goal of reducing the effects of repeated sub-concussive blows to the head at all. As such, the NOCSAE standard SI threshold is well in excess of the values associated with concussions and other serious head injuries.

69.     The NOCSAE helmet standards have remained largely unchanged since 1973, with the exception of the SI ratings, which changed from a 1500 SI threshold to 1200 SI in the early 1990s. According to Mike Oliver, the executive director of NOCSAE, the group's standards do limit linear acceleration (one of the forces behind concussions) but the tests are not designed to rate protection against concussions.

### B.     *Riddell's Defective Helmets and Helmet Liners.*

70.     Riddell has continuously utilized substandard materials and head protection systems in its helmets since the 1970s, making its helmets less effective at absorbing energy upon impact, and thus substantially less likely to reduce the forces transmitted to a player's head from both linear and rotational impacts. As such, they are materially and seriously deficient at reducing a player's risk of injury (both in the short- and long-term).

71.     Using an adequately safe helmet liner system and adequate liner materials is of paramount importance in designing a football helmet. If the density of the liner pads is too soft, the pads will compress too quickly and bottom-out upon impact; whereas, if the liner density is too hard for a given impact, the liner pads will fail to compress and, as a result, not mitigate the energy and forces distributed to the player's head. Thus, it is critical for a helmet to incorporate the right choice in liner materials/padding because the right energy absorbing material is better able to manage impacts over a longer period of time, helping reduce the forces of energy from

17

both linear and rotational impacts, and thereby mitigating the risk of injury.

72.     Though superior material and designs were available, known to Riddell, technologically feasible, reasonably affordable, and likely to have significantly reduced the risk of Plaintiffs' and the Classes' injuries, Riddell failed to take sufficient action to redesign its faulty helmets. Modifying any of its helmets through one of several reasonable alternative designs would not have made its helmets any less desirable to consumers, overall.

73.     Riddell's helmets were defective in multiple ways. First, in designing its helmet liners, Riddell failed to take advantage of safer, relatively affordable improvements in protective foam technology, including by using materials such as thermoplastic polyurethane (TPU) and Vinyl Nitrile (VN). Riddell could have implemented such materials in its helmets by the late 1990s at the absolute latest (but likely could have implemented them much earlier) without substantial change to the character of its helmets.

74.     Second, in designing its helmet liners, Riddell failed to make the liners' pads thick enough to sufficiently protect against the long-term risks of concussive and sub-concussive blows to the head, which would have been a relatively affordable and simple change to make. Riddell could have implemented this design change by the early 1970s without substantial change to the character of its helmets.

75.     Third, Riddell has failed to utilize more effective, relatively affordable protective systems, such as an air cushion system now in use by companies like Xenith. According to Riddell itself, it has been aware of such an air-based system since the 1970s, and as such, Riddell could have continuously implemented such a system since that time without substantially changing the character of its helmets.

76.     Selling helmets to the public *en masse* with the presence of these defects

represents a distinct failure by Riddell to exercise due care, and made their products unreasonably dangerous for use in football—at any level. Had Riddell implemented even one of these alternative designs in its defective helmet lines, the risk of football players (including Plaintiffs and the Classes) being forced to suffer the long-term effects of repeated blows to the head sustained while playing football would have been substantially smaller.

   1.    Using VN or TPU would have made Riddell's helmets safer.

77.    Upon information and belief, Riddell utilized urethane foam padding in the front pad of their VSR helmet model, and continued the use of the same urethane foam padding in the front pad of the Revolution helmets (from 2002 through present).

78.    Upon information and belief, Riddell designed, developed and/or manufactured their own urethane foam pads until 2006. Riddell then began using a third-party supplier to develop, manufacture and/or supply urethane foam pads for use in each of their helmets.

79.    Upon information and belief, Riddell has continued to use a urethane foam in the front pad, even though newer and safer materials exist—and have long existed—that can be used at similar costs.

80.    For example, VN is a relatively soft synthetic rubber material that can fit into a football helmet in the form of a closed-cell foam. VN is superior to foams made out of urethane, as it performs better at attenuating energy overall, and can do so at a wider range of temperatures (thereby reducing force to the forehead and the consequent risk of injury).

81.    In the 1990s, Riddell's consultant Biokinetics examined four different liner materials and configurations for Riddell's football helmets. In November 1999, Biokinetics sent Riddell a memorandum recommending VN as a superior material for it to use in its football helmets. Despite these recommendations, Riddell continued to use urethane foam in the front pad

of its helmets.

82.    Biokinetics recommendation to use VN was well-founded, as the material's subsequent history bore out. For example, hockey helmets containing VN pads date back to at least the early 2000s. Rival helmet maker Schutt also utilized VN in its football helmets' front pads as early as 2003.

83.    In addition, VN pads were not only available but were actually used in the rear and/or side pad components of Riddell's Revolution helmet. Upon information and belief, Riddell eventually began using VN in the rear and/or side pad components of the Revolution helmet as a means to better protect against rotational forces that can cause concussions. Furthermore, upon information and belief, Riddell used VN in the front pads of their lacrosse helmets instead of traditional urethane foam padding. Such conduct demonstrates Riddell's appreciation of the benefits and viability of VN over urethane as a material for foam helmet padding, and for football helmet padding in particular.

84.    The use of VN in only the back and sides of the Revolution helmet also evinces another failure on Riddell's part, since players sustain the majority of impacts to the forehead area—the thinnest layer between the skull and brain. This heightens the importance of makes selecting the proper material for the front pad; but even still, Riddell continued to use substandard materials in its football helmets' front pads.

85.    Upon information and belief, VN has been known, available, technologically feasible and reasonably affordable for Riddell's commercial use since at least the early 1990s (though its utility in consumer products for force-absorbing purposes, such as in shoe soles, has

been observed as early as 1962).[22]

86.     Riddell has faced multiple lawsuits since the mid-1990s where plaintiffs alleged
the use of defective liner materials in its football helmets—including the front pad of the
helmet—that increased risk of injury and/or contributed or caused the plaintiffs' brain injuries.
For example, in the Colorado case *Ridolfi v. Riddell, Inc.*, plaintiff's experts performed a
materials comparison analysis and concluded that use of VN for the front pad instead of urethane
foam would have provided significantly better protection against brain injury. The analysis
concluded that the VN padding was able to attenuate and absorb energy at a better rate across a
wider range of temperatures and conditions than the urethane foam. Specifically, the testing
showed that VN padding, when used in the forehead area of a Riddell helmet, made the helmet
140 percent safer in terms of its energy absorbing capabilities. While Riddell's senior vice
president Thad Ide disputed these findings, he acknowledged that Riddell rival Schutt had
successfully incorporated VN into its helmets' front pads, and was unable to directly rebut tests
that showed the VN pad's outperformance of Riddell's foam pad.

87.     Just as Riddell refused to incorporate VN into its helmets (and later refused to put
it in its helmet liners' front pads), Riddell ignored another potential, safer material for use in its
helmet liners: TPU, an elastomer commonly used in modern sports equipment as protective foam
padding. It has also long been used in a wide variety of products, from automobile instrument
panels to medical devices to wire covers.

88.     TPU foam systems were implemented by Riddell rival Rawlings Sporting Goods
Company, Inc. in as early as 2009 as part of its helmet padding. Xenith, LLC implemented a

---

[22]     *See generally* T.J. Sharp & J.A. Ross, *Nitrile Rubber-Polyvinylchloride Blends*, 35
Rubber Chemistry & Tech. 726 (1962).

TPU system as early as 2007 as part of its helmet liner.[23] Similarly, Schutt implemented TPU in

its helmet padding as early as 2003, after independent laboratory testing showed that TPU

padding was superior to traditional foam padding by providing better impact absorption, better

heat management, and better hygienics.

89.     However, TPU was likely available much earlier—a U.S. Environmental

Protection Agency report from 1997 notes that TPU was, at the time, already "an important

application of polyether polyols," and was at the "upper end" of the spectrum of comparable

materials in terms of performance.[24]

90.     In another case against Riddell, an expert witness for a plaintiff suing Riddell

found that Riddell could have improved the safety of its helmets by employing TPU in its helmet

pads. *See A.K.W. ex rel. Stewart v. Easton Bell Sports, Inc.*, 454 F. App'x 244, 247–48 (5th Cir.

2011).

91.     Riddell has known that different helmets, by design, provide different levels of

absorption which can therefore reduce the amount of force transferred to a player's head and

spine for decades. Nevertheless, instead of improving upon the helmet's liner system and energy

absorbing materials to reduce the force of impact, Riddell has haphazardly manufactured liner

systems with substandard materials in its various helmet models, including but not limited to the

TK2, TAK-29, Pac-3, M155, VSR Series and/or Revolution helmets.

92.     Implementing VN or TPU in its helmet liners would have been simple,

---

[23]     *See* T.E. Gould, et al., *Protective Headgear for Sports* in Textiles for Sportswear, at 221
(Roshan Shishoo ed. 2015).

[24]     *Cf.* Economic Impact Analysis for the Proposed Polyether Polyols NESHAP, U.S.
Environmental Protection Agency Office of Air Quality Planning and Standards, Doc. No. EPA-
453/R-97-013, at 3-3 (May 1997).

technologically feasible, and relatively affordable.

93.     Such conduct demonstrates a lack of due care in manufacturing its helmet liners and pads—both as to Riddell's helmets' front, side, and rear pads—and that Riddell's helmets have been unreasonably dangerous for use in football at any level since at least 1999 as to VN (but likely much earlier) and since at least 1997 as to TPU (but likely much earlier).

                2.     Modestly thicker pads would have made Riddell's helmets safer.

94.     While Riddell employs foam padding throughout its helmet liners, it did not do so in a manner adequate to protect players heads. Had Riddell increased the size of its pads by even one-eighth of an each, it could have significantly improved the safety of its helmets and reduced players' risk of long-term injury.

95.     Riddell has had such an option available since the time it began putting foam liners into its helmets in the 1970s. Technologically speaking, nothing was stopping Riddell from making its padding slightly larger at any time, and the cost of implementing this change at any time would have been relatively minor.

96.     The safety of a thicker padding system is supported both by common sense and science, including a 2011 study by researchers at the Lawrence Livermore National Laboratory, a federally-funded research facility in Livermore, California.[25] The study compared the "impact response of NFL helmet pad systems and U.S. Army pad systems ... at impact velocities up to 20 [feet per second]." This test specifically compared Riddell's helmet padding system against the U.S. Army's.

97.     The study drew two conclusions relevant here. First, "[t]hicker pads perform

_____

[25]     *See* William C. Moss & Michael J. King, *Impact Response of US Army and National Football League Helmet Pad Systems*, U.S. Dep't of Energy, LLNL-SR-471-496 (Jan. 4, 2011).

better at all velocities." Second, in comparing the pads of Riddell-manufactured NFL helmets to those used by the U.S. Army's Advanced Combat Helmet (ACH), the researchers found that the NFL pads did not outperform the ACH at speeds less than 20 feet/second (and generally underperformed the ACH). "By simply using helmet shells that are at least one size larger with thicker pads, the injuries from impacts, especially severe impacts, may be reduced significantly."

98.    As one of the study's authors noted, the study's methods and designs "also are applicable to the civilian sector, particularly contact sports helmet design."[26]

99.    Riddell knows the necessity of thick helmet padding all too well. In the case *Arnold v. Riddell, Inc.*, 882 F. Supp. 979 (D. Kan. 1995), a jury awarded a plaintiff over $12 million based on claims that Riddell's helmets were defectively designed. *Id.* at 995. Though the case focused on the helmet's ability to reduce the risk of cervical spine injury, it dealt with a similar issue: the ability of a Riddell helmet's energy attenuation system to prevent the excess transfer of force to a player upon taking a hit. *Id.* at 989. And in that case, "[i]t was undisputed that lower force levels were recorded when Riddell experimented with increasing the energy attenuating pads by 1/8 inch [sic] in the crown. Nevertheless, Riddell decided against adding the extra padding." *Id.* (emphasis added).

100.    This was part of the reason why, in the mid- to late-1990s, Riddell apparently increased the thickness of its helmet padding. *See Rodriguez v. Riddell, Inc.*, Appellees' Brief [Corrected], 2000 WL 33982598 (5th Cir. May 23, 2000) ("Riddell now uses larger, thicker energy pads in their newer VSR-4 helmet ... which Defendants acknowledge can mean the

---

[26]    Stephen P. Wampler, Researchers Find Way to Mitigate Traumatic Brain Injury in Study for Joint IED Defeat Organization, Lawrence Livermore Nat'l Lab. (Apr. 18, 2011), https://www.llnl.gov/news/llnl-researchers-find-way-mitigate-traumatic-brain-injury-study-joint-ied-defeat-organization.

difference between a traumatic brain injury or no injury."). Nevertheless, Riddell did not go far enough, and to this day its helmets remain unreasonably dangerous and unable to adequately protect football players' heads from the risks of receiving repeated concussive and sub-concussive blows to the head.

101.   Such a failure to correct its helmets faulty condition, and to manufacture them properly in the first instance, represents a failure to exercise due care on Riddell's part.

102.   The proper design of foam padding in the football helmet liner system is extremely important, including with regard to the padding's thickness. Nevertheless, instead of improving upon the helmet's liner system to adequately reduce the force of impact, Riddell has failed to implement thick enough padding in various helmet models, including, but not limited to, its TK2, TAK-29, Pac-3, M155, VSR Series and/or Revolution helmets. Such a design change would have been minor, simple, technologically feasible, and relatively affordable, both in the 1970s and today.

### 3.   Using an air cushion system would have made Riddell's helmets safer.

103.   Riddell has also failed to incorporate newer, safer and better energy absorbing technology into its helmets, such as air-filled chambers.

104.   In a *New York Times* article discussing the energy absorbing characteristics of helmet liner materials, another helmet manufacturer, Xenith LLC, recommended the use of thermoplastic shock absorbers throughout the liner system because these air-filled absorbers were capable of distributing a wider range of forces in a manner that reduced forces transferred to the head.[27]

105.   Xenith's air chamber technology utilizes no fewer than 18 thermoplastic air-filled

---

[27]   Alan Schwartz, *Helmet Design Absorbs Shock in New Way*, N.Y. Times (Oct. 27, 2007).

shock absorbers embedded in a flexible cap located within the helmet's "bonnet" (*i.e.*, the space between the shell and the top of the liner). Upon impact, the thermoplastic pads—shaped like discs with a small hole in the middle—collapse to absorb and dissipate the energy, as air is pushed out of the pad. This helps to minimize head movement during impact.

106.    As Xenith's founder explained in 2008, "[w]hen you force or any fluid to flow through a small hole, you get an adaptive response: the harder [the disc] is hit, the stiffer it behaves, because you are generating more resistance inside the disk"—thus encouraging energy absorption and helping prevent dispersion of energy into a player's head.[28]

107.    Laboratory tests performed by Xenith showed that its thermoplastic disks could withstand hundreds of impacts without any notable degradation in performance, a drawback commonly found in traditional and/or urethane foams.

108.    Riddell has unquestionably been aware of such technology for decades, but chosen not to implement it—indeed, it apparently abandoned the technology on purpose. Responding to claims in a 2012 article that Xenith's helmets were superior (or that Riddell's were outdated), Riddell spokeswoman Erin Griffin argued that "Riddell patented throttled-air technology in the 1970s and tried, used and discontinued using it, and has since moved on."[29]

109.    Riddell's view of this technology was, and is, wrong. Replacing Riddell's system with an air-filled cushion system would not only have reduced the risk of brain injury to players, but has been shown to maintain its energy absorbing characteristics over a longer period of time.

---

[28]    Brittany Sauser, *Preventing Concussions*, MIT Tech. Rev. (Feb. 11, 2008), https://www.technologyreview.com/s/409516/preventing-concussions/.

[29]    Daniel Kaplan, *Helmet Maker Uses Safety As Sales Tool*, SportsBusiness J. (May 7, 2012), https://www.sportsbusinessdaily.com/Journal/Issues/2012/05/07/Marketing-and-Sponsorship/Xenith.aspx.

This is important, because once a helmet is put in use by high schools and colleges, it is typically reconditioned every one to three years to ensure it meets the NOCSAE certification standards.

110.     The goal of a helmet should be to actually protect the player throughout the widest range of injurious impact conditions possible and mitigate the risk of head injury and improve the level of safety during play. Riddell has failed to meet this goal by continuing to use a defective liner system that does not attenuate energy in an efficient and effective manner to reduce the force transmitted to a player's head and minimize the risk of injury.

111.     Why Riddell abandoned air-based padding systems—despite knowing about them since at least the 1970s—is anyone's guess. This design is superior, technologically feasible, and reasonably affordable (at least in the view of Riddell's competitors who use this system).

112.     As indicated, the proper system for the front pad of the liner system is extremely important. Nevertheless, instead of improving upon the helmet's liner system to adequately reduce the force of impact, Riddell has failed to implement a superior air chamber system in its various helmet models, including, but not limited to, its TK2, TAK-29, Pac-3, M155, VSR Series and/or Revolution helmets. Such a design change would have been minor, simple, technologically feasible, and relatively affordable, both in the 1970s and today.

113.     Failing to implement this design—and indeed, abandoning it despite its superiority—represents a failure to exercise due care on Riddell's part, and has made its helmets unreasonably dangerous for use in football at any level.

C.     *Riddell's Early Warning Labels Failed to Adequately Warn Players.*

114.     Despite knowing that its helmets were not designed to prevent or meaningfully reduce concussions, Riddell did not place any warning labels on its football helmets informing players of the inherent risks of playing football before 1983.

115.     Starting in 1983, Riddell began placing the first warning labels onto the backs of its helmets. Riddell's warning labels were roughly the size of postage stamps and were not easily identifiable by players putting on and taking off Riddell's helmets. Nonetheless, had the player actually found Riddell's label, he or she would have seen a fundamentally misleading warning:

> Do not use this helmet to strike an opponent. Such an action is against football rules and may cause severe brain or neck injury. Playing the game of football in itself can cause injury, and no helmet can prevent all such injuries.

116.     Setting aside the absurdity of instructing a football player not to "strike" an opponent, a reasonable consumer could interpret Riddell's warning to mean that the helmet was "safe" and would generally protect the player so long as he followed the "football rules."

117.     Most importantly, Riddell's warning labels failed to effectively disclose the long-term dangers these players would be exposed to while wearing Riddell helmets and using them for their intended purposes, and misled them as to the severity of those dangers.

118.     Riddell breached its duty to properly educate and/or properly warn users of these dangers. Such a warning should have alerted, informed, and/or reminded users of the hazards associated with the product's use; the recommended methods of using the product; certain limitations or restrictions placed on its use; procedures for properly fitting or adapting the product to an individual user; procedures to be followed if an injury (or suspected injury) occurred while using the product; and how and when an injured football player might return to football after recovery from a head injury.

119.     Riddell failed to include any such adequate warnings—in the form of on-product labels affixed to different portions of the helmet—that would alert and/or inform football players of the true risks and hidden dangers associated with concussions, brain injuries and repetitive brain trauma. Nor did Riddell provide sufficient post-marketing warnings once its products were

in the stream of commerce.

120.     Riddell failed to disclose that the helmets as supplied did not perform in the manner represented. By failing to provide adequate warnings, Riddell created and profited off of a false sense of protection and led players—including Plaintiffs and the Classes—to take more risks, as opposed to mitigating such risks.

121.     At a bare minimum, Riddell's warnings should have: (1) been conspicuous and noticeable to those needing to be warned; (2) explicitly identified the hazards of long-term injuries from concussive and sub-concussive blows to the head while wearing the helmet that Riddell knew of, or should have known of; (3) stated the consequences associated with coming into contact with such hazards; and (4) fully and adequately advised the user as to how to avoid being exposed to or affected by the hazards.

122.     Even though the Riddell's helmets were NOCSAE certified, Riddell knew or should have known the safety standards set forth by NOCSAE are not designed to rate protection against concussions or long-term brain injuries, and failed to disclose that fact to players. In a November 2000 report sent to Riddell, Biokinetics (the biomechanics firm hired by Riddell) wrote that SI scores well below the 1200 mark still carried a high risk of concussion and brain injury. **The report concluded "a concussion is almost certain to occur at SI levels half that of the current NOCSAE standard."**

123.     Additionally, Biokinetics reported that a player wearing a helmet that scored 291 SI during an impact—well within the safety threshold—would have a 50 percent probability of suffering a concussion, and a helmet that scored 559 SI during the same impact would carry a 95 percent risk of concussion.

124.     Other studies have suggested that the NOCSAE's SI index, which rates helmet

protectiveness based solely on the risk of skull fracture, is insufficient as a stand-alone concussion or near-concussive injury risk metric.[30]

125. Riddell's helmet warnings were inadequate based upon warning and design defects or deficiencies that failed to include the above-referenced considerations. Riddell knew or should have known of its warnings' deficiencies and failed to adequately correct these deficiencies at any time.

**D.    *Riddell's Claims its Revolution Helmets Reduce Concussions by Over 30%.***

126. By the early 2000s, concussions in football players had begun to receive increasing attention. As such, Riddell sought to capitalize on the growing concussion crisis and developed a new product line in response.

127. In 2002, Riddell released a new helmet—the first in a line of helmets—called the "Revolution," allegedly designed and marketed to "reduce the incidence of concussions" as a "first-of-its-kind helmet." Based on these claims, the Revolution series would become one of the most widely used helmets in football and eventually lead to millions of dollars in sales for Riddell. Thad Ide, the Vice President of Research and Development at Riddell, commented on the release of the Revolution helmet: "We know there are more than 100,000 concussions due to football in the United States every year. We hope we can reduce that number."

128. In developing the Revolution helmets, Riddell utilized the NOCSAE SI test to rate and self-certify helmets. As described above, despite achieving a passing score on the SI scale, the Revolution helmets could not prevent concussions. Even worse, Riddell engaged in a marketing campaign where it misled the public, including football players, that its helmets

---

[30]    A. Bartsch, et al., *Impact Test Comparisons of 20th and 21st Century American Football Helmets*, J. Neurosurgery 116:222-233 (2012).

reduce concussions by a significant factor.

1.     Riddell Commissioned a Biased Study of the Revolution Helmet.

129.     After releasing the Revolution helmet, Riddell funded research at the University

of Pittsburgh Medical Center ("UPMC Study") to evaluate its helmet. The findings of the study

were published in the February 2006—four years after Riddell began marketing it—in an issue

of the scientific journal Neurosurgery.[31] Based on the UPMC Study, Riddell began to tout the

Revolution helmet as reducing concussions by 31%. However, the UPMC Study had significant

issues that undercut its claims. Not only did Riddell fund the study itself, and not only did

several of the study's researchers have a personal financial stake in the study's outcome, but the

study contained serious flaws that seriously undermine its conclusions.

130.     First, several of the authors of the UPMC Study had significant financial

connections to Riddell. Riddell directly employed one of the researchers, Thad Ide, who was

Riddell's vice president of research and development. Even worse, Ide had a personal financial

interest in the positive outcome of the study because he was the *owner of at least two patents*

covering the Revolution helmets. Furthermore, Riddell payed the salaries of two other UPMC

Study authors: Micky Collins and Mark Lovell.

131.     Additionally, three of the study's authors are co-owners of ImPACT, the

computerized neurocognitive testing system used on UPMC Study subjects. Upon information

and belief, ImPACT and Riddell entered into an agreement whereby Riddell would receive a

commission for any ImPACT sale that is completed through a Riddell-related contact.

---

[31]     M. Collins, *et al, Examining Concussion Rates And Return To Play In High School Football Players Wearing Newer Helmet Technology: A Three-Year Prospective Cohort Study*, NEUROSURGERY, Vol. 58, No. 2. (February, 2006).

132.    Moreover, many in the science community have questioned the reliability and validity of ImPACT's software, noting that "the vast majority of studies evaluating ImPACT have been written by the very researchers who developed it."[32] Likewise, in 2007 an investigation by ESPN.com found that "on at least seven occasions since 2003, Lovell has authored or co-authored studies on neuropsychological testing, including papers directly evaluating ImPACT, without disclosing his roles in creating and marketing ImPACT."[33]

133.    The UPMC Study also contained serious methodological flaws. The authors of the UPMC Study compared the concussion rates and recovery time for athletes wearing *new* Riddell Revolution helmets to athletes wearing what they referred to as "traditional helmets." These helmets were not new, but "reconditioned". In this context, reconditioning involves cleaning, sanitizing, inspecting, repairing (if necessary) and recertifying the helmets—but rarely does the process involve replacing the foam padding in the liner system of the helmet, a critical part of the helmet that wears out and degrades over time.

134.    Moreover, the UPMC Study was a "prospective cohort study," rather than being based on a random sample, and focused on a subset of high school players in the Pennsylvania Athletic Association. From 2002 to 2004, the UPMC Study tracked approximately 2,000 high school football players, with slightly more than half the subjects wearing Riddell's new Revolution helmets and slightly fewer wearing "traditional" helmets. The traditional helmets were drawn from the schools' used helmet inventories. Further eroding the study's scientific credibility is the fact that the UPMC Study participants were not randomly assigned helmets, the

---

[32]    *Neuropsychological testing for concussions might not be panacea*, http://www.espn.com/espn/otl/story/_/id/8297794/neuropsychological-testing-concussions-not-panacea (last visited Oct. 30, 2018).

[33]    *Id.*

age of each helmet was not provided (nor assessed by researchers, upon information and belief). The failure to control for age is a significant omission, as helmets inevitably perform worse as they get older.

135.    Dr. Robert Cantu, a neurosurgeon and leader in the field of sports-related concussion research, wrote a comment published in the *Journal of Neurosurgery* stating that the UPMC Study contained a "serious, if not fatal methodological flaw" and warned the public to be "cautious in drawing any conclusions from this type of study."

136.    The final three-year study considered only 2,141 of the 2,207 participants, with 1,173 fitted with the Revolution and 968 fitted with traditional helmets. Using these numbers, as opposed to the total number of participants, the concussion rates were 5.3% and 7.6% respectively, which the authors described as a "statistically significant difference." According to two of the study's authors, the results "demonstrated *a trend* toward a lowered incidence of concussions" but the "limited size sample precludes a more conclusive statement of findings at this time." This is a critical and dispositive limitation that Riddell ignored and concealed when marketing the Revolution line of helmets.

2.    Riddell Used the UPMC Study Results to Mislead the Public.

137.    Riddell's marketing claims about the Revolution's ability to reduce concussions was fundamentally misleading. The University of Pittsburgh Medical Center itself not only disputed the 31% figure, but notified Riddell that "this data should not be used as a marketing ploy or marketing tactic from a scientific paper that was done not for those purposes." Additionally, one of the authors, Dr. Joseph Maroon, later represented that the study found that an athlete wearing the Revolution helmet was associated with "approximately a 31% decreased relative risk and 2.3% decreased absolute risk for sustaining a concussion in the study." By

focusing solely on the larger number, which referred only to a relative decrease in risk, and without acknowledging the study's limitations, Riddell misrepresented its helmets' benefits.

138.  Nevertheless, Riddell made the 31% concussion reduction claim the centerpiece of its marketing campaign, which fueled sales of the Revolution helmet. Riddell launched a media campaign featuring the concussion reduction claim which, according to its "Riddell Revolution UPMC Media Campaign Highlights" news release, created "over 60 million media impressions, nearly 150 television placements, over 100 newspaper clips, over 250 on-line placements, [and] 6 live sports radio interviews."[34]

139.  Even more alarming was Riddell's use of the 31% reduced risk of concussion claim to sell helmets *that were not actually tested in the UPMC Study*. The UPMC Study only tested the Riddell Revolution helmet, but not the Revolution Speed, the Revolution IQ, the Revolution IQ Hits, and the Revolution Youth helmets. Nevertheless, Riddell falsely marketed the complete Revolution line of helmets as having "concussion reduction technology." As a result of Defendant's misleading 31% anti-concussion marketing campaign, sales increased across all helmet product lines. Sales of Revolution helmets skyrocketed to more than 2 million between 2002 and 2009 on the basis of the helmets having "concussion reduction technology."

3.  The FTC Cracks Down on Riddell's Marketing.

140.  From 2006 until early 2011, Defendant misrepresented the UPMC Study results and the protective capability of its Revolution helmets to increase its sales.

141.  As Revolution helmet sales continued to soar, Riddell's anti-concussion claims

---

[34]  Concussions and the Marketing of Sports Equipment: Hearings before the Committee on Commerce, Science, and Transportation, Senate, 112th Cong. 6 (2011) (Statement of Hon. Tom Udall, U.S. Senator from New Mexico).

caught the attention of Senator Tom Udall, who sent a letter to the Federal Trade Commission requesting an investigation into "misleading safety claims and deceptive practices in the helmet industry." Senator Udall was quoted as saying "several helmet manufacturers advertise helmets as built with 'concussion reduction technology' or 'designed with the intent to reduce concussions.' These helmets are also marketed as meeting the [NOCSAE] voluntary industry standard for football helmets. However, this football helmet standard does not specifically address concussion risks."

142. The FTC investigation focused on the flaws in the UPMC Study, concluding that the limitations of the study were sufficiently serious to preclude any conclusion that the design of the Revolution helmets was responsible for any purported reduction in concussion rates.

143. Instead of contesting the FTC's findings or its criticisms of the UPMC Study's methodologies and unreliability, Riddell instead chose to wholly abandon making the 31% concussion reduction claim in 2011.

**FACTS SPECIFIC TO PLAINTIFF JONES**

144. From 1983 until 1986, Plaintiff Jeffrey Jones played football at Waterford Mott High School in Waterford Township, Michigan, and later at Detroit Country Day School in Beverly Hills, Michigan. Between 1986 and 1990, Jones was a defensive tackle for Michigan State University's college football program.

145. While participating in his high school and college football programs, Jones wore a Riddell helmet at all times.

146. Jones suffered at least one known concussion during his high school football career, following a severe blow to the head that required him to be taken to the hospital in an ambulance.

147. Jones suffered at least seven known concussions during his time at Michigan State

University, all due to football, and all of which were contemporaneously reported to the team's training staff. Specifically, Jones received concussions during football team practices at Michigan State University in September 1986, October 1986, August 1987, and September 1988. In addition, he received concussions during Michigan State University football games in December 1989, November 1990, and December 1990.

148.    On top of this, Jones received repeated sub-concussive blows to the head throughout his high school and college football career.

149.    Despite this, Jones continued playing football in high school and college, relying on the belief that his helmet would ultimately keep his head (and brain) safe.

150.    Jones now suffers from emotional instability, memory loss, and depression. These symptoms have worsened over time and continue to develop negatively. These maladies are the direct and proximate result of Riddell's defective helmets.

151.    Riddell did not warn Jones of the long-term consequences of playing football, even though Riddell knew or should have known about the dangers of long-term brain injuries to players resulting from playing football while wearing its helmets. Indeed, had Riddell provided clear, conspicuous, and complete warnings about the risks of playing football while using its products, Jones would not have used a Riddell helmet at all.

152.    Riddell's failure to implement sufficient warnings or design its helmets using adequate liner materials and cushioning systems was the direct and proximate cause of Jones's injuries.

## FACTS SPECIFIC TO PLAINTIFF MILNE

153.    From 1987 until 1989, Plaintiff Brian Milne played football at Fort LeBoeuf High School in Waterford, Pennsylvania. Between 1991 and 1996, Milne was a fullback for Penn State University's college football program. While participating in his high school and college

36

football programs, Milne wore a Riddell helmet at all times.

154.    Milne suffered five concussions during his time at Penn State University, all due to football, and at least one of which was reported to the team's medical staff. These concussions include those Milne sustained during a team practices at Penn State University in August 1993, and in football games in November 1994 and October 1995.

155.    On top of this, Milne received repeated sub-concussive blows to the head throughout his high school and college football career.

156.    Despite this, Milne continued playing football in high school and college, relying on the belief that his helmet would ultimately keep his head (and brain) safe.

157.    Milne now suffers from dementia, cognitive impairment, memory loss, emotional instability, loss of concentration, headaches, depression, and motor impairment, among other ailments. These symptoms have worsened over time and continue to develop negatively, and recently forced him to retire from his job as a police officer. These maladies are the direct and proximate result of Riddell's defective helmets.

158.    Riddell did not warn Milne of the long-term consequences of playing football, even though Riddell knew or should have known about the dangers of long-term brain injuries to players resulting from playing football while wearing its helmets. Indeed, had Riddell provided clear, conspicuous, and complete warnings about the risks of playing football while using its products, Milne would not have used a Riddell helmet at all.

159.    Riddell's failure to implement sufficient warnings or design its helmets using adequate liner materials and cushioning systems was the direct and proximate cause of Milne's injuries.

## FACTS SPECIFIC TO PLAINTIFF JOHNSON

160.    Between 1996 and 2003, Plaintiff Patrick Johnson played football at Lexington Catholic High School in Lexington, Kentucky and then at Morehead State University in Morehead, Kentucky, in both locations playing the position of defensive end.

161.    While participating in his high school and college football programs, Johnson wore a Riddell helmet at all times. Indeed, one of the assistant coaches on his high school team was, upon information and belief, a Riddell sales representative.

162.    Johnson suffered at least three known concussions while playing football. Despite the concussive and sub-concussive blows to the head Johnson received during gameplay and practice, he continued to play football, relying on the belief that his helmet would ultimately keep his head (and brain) safe.

163.    Johnson received his first concussion in high school, during a football camp held during the summer after his junior year. During a play, Johnson's head collided with another player's and he blacked out. He was taken off of the field immediately.

164.    In another instance, during a practice at Morehead in college, Johnson sustained a blow to the head which necessitated him sitting out from the remainder of practice. He saw the trainer for the team, who advised him that if he sustained another hit, he would be done with football.

165.    Johnson now suffers from memory loss, impaired judgement, unusual aggression, limited ability to concentrate, impulsiveness, and depression. In 2012, his depression became so severe that he attempted to commit suicide—unsuccessfully. While Johnson's depression has receded somewhat, his other symptoms worsen each day.

166.    Riddell did not warn Johnson of the long-term consequences of playing football, even though Riddell knew or should have known about the dangers of long-term brain injuries to

players resulting from playing football while wearing its helmets. Indeed, had Riddell provided clear, conspicuous, and complete warnings about the risks of playing football while using its products, Johnson would not have used a Riddell helmet. At minimum, he would have played the game differently by being more cautious and safe during gameplay and practice.

167.    Riddell's failure to implement sufficient warnings or design its helmets using adequate liner materials and cushioning systems was the direct and proximate cause of Johnson's injuries.

## FACTS SPECIFIC TO PLAINTIFF SCOTT

168.    Between 1981 and 1985, Plaintiff Randall Scott played football at Cleburne High School, in Cleburne, Texas and then at University of Texas at Arlington, as a running back and punt returner.

169.    While participating in his high school and college football programs, Scott wore a Riddell helmet at all times.

170.    Scott suffered at least two concussions while wearing his Riddell helmet and suffered innumerable sub-concussive blows to the head. Despite these concussive and sub-concussive blows, he continued to play football, relying on the belief that his helmet would ultimately keep his head (and brain) safe.

171.    Scott's mental state began to deteriorate almost immediately after college. At times, he would wander the streets of his town, seemingly lost, until a family member was called to come retrieve him.

172.    Scott now suffers from memory loss, impaired judgement, unusual aggression, limited ability to concentrate, limited attention span, unusual inability to multi-task, impulsiveness, reduced problem-solving capability, and depression. These maladies are the direct and proximate result of Riddell's defective helmets.

173.    Riddell did not warn Scott of the long-term consequences of playing football, even though Riddell knew or should have known about the dangers of long-term brain injuries to players resulting from playing football while wearing its helmets. Indeed, had Riddell provided clear, conspicuous, and complete warnings about the risks of playing football while using its products, Scott would not have used a Riddell helmet.

174.    Riddell's failure to implement sufficient warnings or design its helmets using adequate liner materials and cushioning systems was the direct and proximate cause of Scott's injuries.

**FACTS SPECIFIC TO PLAINTIFF WILKINS**

175.    Between 2008 and 2014, Plaintiff Edward Wilkins III played football at Lovejoy High School in Jonesboro, Georgia, Union Grove High School, in McDonough, Georgia, and then at University of Southern Mississippi. At different times, Wilkins played the positions of defensive end and defensive back.

176.    While participating in his high school and college football programs, Wilkins wore a Riddell helmet at all times.

177.    Wilkins suffered at least three known concussions and multiple sub-concussive hits while playing high school football. Despite these concussive and sub-concussive blows to the head, he continued to play football, relying on the belief that his helmet would ultimately keep his head (and brain) safe.

178.    Wilkins once sustained a concussion after a collision with another player in the end zone on a pass play. Wilkins was dizzy getting up and was unsure of what was taking place at the time.

179.    Wilkins as taken out of the game. He was seen by a trainer and was taken to the emergency room. Wilkins was subsequently diagnosed with a mild concussion.

180. Wilkins now suffers from impaired judgement, unusual aggression, impulsiveness, reduced problem-solving capability, depression, memory loss, and unusual confusion.

181. Riddell did not warn Wilkins of the long-term consequences of playing football, even though Riddell knew or should have known about the dangers of long-term brain injuries to players resulting from playing football while wearing its helmets. Indeed, had Riddell provided clear, conspicuous, and complete warnings about the risks of playing football while using its products, Wilkins would not have used a Riddell helmet—or played football at all.

182. Riddell's failure to implement sufficient warnings or design its helmets using adequate liner materials and cushioning systems was the direct and proximate cause of Wilkins's injuries.

## FACTS SPECIFIC TO PLAINTIFF HARRIS

183. Between 1995 and 1999, Plaintiff John Harris II played football at Sam Houston High School in San Antonio, Texas in the position of, alternative, safety and cornerback.

184. While participating in his high school's football program, he wore a Riddell helmet at all times.

185. Harris suffered at least three concussions while wearing his Riddell helmet and suffered innumerable sub-concussive blows to the head. Despite these concussive and sub-concussive blows to the head, he continued to play football, relying on the belief that his helmet would ultimately keep his head (and brain) safe.

186. Particularly, Harris sustained multiple hits that resulted with him being hit in the back of the head or the back of his head hitting the ground.

187. On one occasion, Harris received a concussion while wearing his Riddell helmet. After leaving the field, Harris could not even remember his name for several minutes.

188.     On another occasion, Harris received a concussion and blacked out on the field for a short amount of time.

189.     The last concussion he sustained resulted in him being taken from the field and leaving the game in an ambulance. Harris received an MRI at the hospital and doctors diagnosed him with brain swelling. This was the end of his football career—even though Harris had been a sought-out recruit for various college football programs, he could no longer pursue those opportunities.

190.     Harris now suffers from unusual confusion, unusual aggression, memory loss, unusual inability to multi-task, reduced capability to plan, depression, reduced problem-solving capability, and impulsiveness.

191.     Riddell did not warn Harris of the long-term consequences of playing football, even though Riddell knew or should have known about the dangers of long-term brain injuries to players resulting from playing football while wearing its helmets. Had Riddell provided clear, conspicuous, and complete warnings about the risks of playing football while using its products, Harris would not have used a Riddell helmet—indeed, he would not have played football at all.

192.     Riddell's failure to implement sufficient warnings or design its helmets using adequate liner materials and cushioning systems was the direct and proximate cause of Harris's injuries.

## CLASS ACTION ALLEGATIONS

193.     **Class Definitions**: Plaintiffs bring this action on behalf of themselves and a class of similarly situated individuals, defined as follows:

> **High School Class**: All individuals who wore a Riddell helmet while playing in a high school level football program between 1975 and the present.

In addition, Plaintiffs Jones, Milne, Johnson, Scott and Wilkins bring this action on behalf of themselves and a class of similarly situated individuals, defined as follows:

> **College Class**: All individuals who wore a Riddell helmet while playing in a college level football program between 1975 and the present.

Excluded from the High School Class and College Class (collectively referred to as "the Classes" unless otherwise indicated) are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' attorneys and Defendant's attorneys; and (6) the legal representatives, successors, and assigns of any such excluded persons.

194. **Numerosity**: The exact number of members of the Classes is unknown and not available to the Plaintiffs at this time, but it is clear that individual joinder is impracticable and that the number of class members is in the tens of thousands. Members of the Classes can be identified through a combination of Defendant's records, third-party discovery, and affidavits.

195. **Commonality and Predominance**: There are many questions of law and fact common to the claims of the Plaintiffs and the putative members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to, the following:

> a. Whether Defendant was negligent in the design, testing, marketing, and engineering of the helmets worn by Plaintiffs and the Classes;
>
> b. Whether Defendant's helmets were defective in design;
>
> c. Whether Defendant's helmets were unreasonably dangerous;

d. What Defendant knew about the dangers of repeated concussive and sub-concussive hits in high school and college football, and when; and

e. Whether Defendant failed to adequately warn Plaintiffs of the substantial dangers involving the foreseeable use of its helmets.

196. **Typicality**: Plaintiffs' claims are typical of other members of the Classes, in that Plaintiffs and the putative members of the Classes sustained damages arising out of Defendant's uniform wrongful conduct.

197. **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex class actions. Plaintiffs have no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs.

198. **Policies Generally Applicable to the Classes**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes and making final injunctive relief appropriate with respect to the Classes. Defendant's policies challenged herein apply and affect members of the Classes uniformly and Plaintiffs' challenge to these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs. Plaintiffs and the members of the Classes have suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

199. **Predominance and Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal

and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiffs and the Classes)**

200.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

201.     Defendant was negligent in designing, testing, marketing, and selling the helmets worn by Plaintiffs and the members of the Classes.

202.     Prior to, during, and after the years in which Plaintiffs played football, Defendant knew of the harmful long-term effects of concussive and sub-concussive blows to the head sustained by Plaintiffs and the Classes while wearing its purportedly protective equipment, and knew that its helmets could not sufficiently guard against such head injuries. However, Defendant misrepresented and concealed such facts to induce Plaintiffs and the Classes to continue using Riddell helmets. Plaintiffs and the Classes relied on these misrepresentations, believed them to be true, and continued to utilize the Riddell helmets in justifiable reliance on the truth of Defendant's representations.

203.     Defendant owed a duty of care to Plaintiffs and the Classes in the design, testing, marketing, and sale of the helmets and all components and sub-assemblies of the helmets, both because of Defendant's representations and the nature of its products. Defendant failed in its duty by designing and selling a helmet known to be inadequate to protect players like Plaintiffs and members of the Classes from concussive and subconcussive hits in football.

204.     Defendant was or should have been aware that repeated blows to the head can

45

cause long-term brain injuries and neurocognitive injuries in its customers, including, but not limited to, memory loss, dementia, clouded cognition, depression, and CTE, and their related symptoms. Defendant breached its duty of reasonable care by failing to provide necessary and adequate safety and instructional materials and warnings that relayed the risks, and means available to reduce and/or minimize the risks, of brain injuries while playing football using its helmets.

205.    Defendant failed to provide necessary and adequate information, warnings, and/or instructional materials regarding the fact that other models of helmets provided greater shock attenuation following blows to the head area.

206.    Defendant possessed special and superior knowledge of the potential risks and substantial dangers to users of its football helmets. However, Defendant negligently and carelessly failed to adequately warn or instruct users of the potential risks and dangerous and defective conditions of its football helmets. This included, but was not limited to, informing them of helmets with a safer means of attenuating and absorbing the foreseeable forces of impact in order to minimize and/or reduce the forces and energy directed to the player's head.

207.    Plaintiffs and the Classes did not know at the time they played football, nor could they have discovered through the exercise of reasonable diligence, that Defendant's breaches and misrepresentations increased Plaintiffs' and the Classes' risk and exposure to traumatic brain injuries.

208.    Plaintiffs and the Classes were injured as a direct and proximate result of playing football while wearing Defendant's faulty helmets, and are entitled to all relief available to them at law. Plaintiffs and the Classes have incurred damages that included, but are not limited to, permanent brain damage, past and future medical costs, other out of pocket expenses, lost time,

lost future earnings, and other physical and non-physical damages.

### SECOND CAUSE OF ACTION
### Products Liability – Design Defect
### (On Behalf of Plaintiffs and the Classes)

209.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

210.    At the time Riddell helmets worn by Plaintiffs and the Classes were designed,
manufactured, sold, and distributed, they were defective in design, unreasonably dangerous,
unsafe for their intended purpose, and failed to perform as safely as an ordinary consumer would
expect when used in an intended or reasonably foreseeable manner. This was so because
Riddell's helmets did not provide adequate protection against the foreseeable risks of concussive
brain injury, or repeated concussive and sub-concussive hits sustained while playing football.

211.    At all times, the helmets were being used by Plaintiffs and the Classes for the
purpose for which they were intended.

212.    Defendant acted unreasonably at the time of designing its helmets in light of the
foreseeable risks of injury from the use of its helmets. Any purported benefits in the designs of
its helmets do not outweigh the risk of danger inherent in their defective designs.

213.    The design defects include, but are not limited to, the following:

  a.    Helmet frontal pads with materials incapable of adequately distributing
        force;

  b.    Helmet liner systems that lacked a safe means of attenuating and
        absorbing the foreseeable forces of impact in order to minimize and/or
        reduce the forces and energy directed to the player's head, both due to the
        use of inadequate materials and inadequate overall systems (as compared
        to superior systems such as an air chamber-based system); and

  c.    Helmet liner systems comprised of pads too thin to adequately protect
        players' heads.

214.    Had Riddell implemented any one of many potential alternative designs prior to
distributing its helmet lines, Plaintiffs' risk of injury would have significantly decreased. Riddell

could have made larger pads in its helmets as soon as it started manufacturing padded helmets in the 1970s. Similarly, it could have continued to incorporate air chamber-based systems into its helmets at that time (per its representations that it used such technology in the 1970s and discontinued it). And Riddell could have swapped out its inferior padding for superior VN padding as early as 1999, or for superior TPU padding as early 1997 (although both were likely available and feasible to use much earlier).

215.    As such, Defendant is strictly liable for designing a defective and unreasonably dangerous product. A safer alternative design was economically and technologically feasible at the time the product left the control of Defendant, and Defendant's helmets were unreasonably dangerous at the time they left Defendant's control.

216.    Plaintiffs and the Classes were injured as a direct and proximate result of playing football while wearing Defendant's faulty helmets, and they are entitled to all relief available to them at law. Plaintiffs and the Classes have incurred damages that included, but are not limited to, permanent brain damage, past and future medical costs, other out of pocket expenses, lost time, lost future earnings, and other physical and non-physical damages.

**THIRD CAUSE OF ACTION**
**Products Liability – Failure to Warn**
**(On Behalf of Plaintiffs and the Classes)**

217.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

218.    Defendant knew or should have known of the substantial dangers involved in the reasonably foreseeable use of its helmets.

219.    Defendant failed to provide necessary and adequate safety and instructional materials warning of the risk involved in using its helmets, as well as the means available to reduce and/or minimize the risk of long-term brain injuries while playing football.

220.    Defendant ignored years of published literature warning of the dangers of concussive and sub-concussive blows to the head in contact sports, including football, and the brain-injuries which can result over the long-term.

221.    Defendant knew that these substantial dangers were not recognizable to an ordinary consumer or user, including players like Plaintiffs and the Classes, and that such a person would use its products without inspection for defects and/or in reliance on Riddell's protecting them from serious brain injuries caused by playing football.

222.    Plaintiffs and the Classes neither knew, nor had reason to know of the existence of these defects, or increased risks of harm, and used the helmets in a foreseeable manner at all times. Defendant did, and as such had a duty to disclose these issues to Plaintiffs. As such, Defendant's products were unreasonably dangerous at the time they left Defendant's control.

223.    Plaintiffs and the Classes were injured as a direct and proximate result of playing football while wearing Defendant's faulty helmets, and are entitled to all relief available to them at law. Plaintiffs and the Classes have incurred damages that included, but are not limited to, permanent brain damage, past and future medical costs, other out of pocket expenses, lost time, lost future earnings, and other physical and non-physical damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Jeffrey Jones, Brian Milne, Patrick Johnson, Randall Scott, Edward Wilkins III, and John Harris II, individually and on behalf of the Classes, request that the Court enter an Order providing for the following relief:

A.    Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as Class Representatives, and appointing their counsel as Class Counsel;

B.    Declaring that Defendant's actions, as set out above, constitute negligence and

strict products liability;

C.      Awarding all economic, monetary, actual, consequential, compensatory, and punitive damages caused by Defendant's conduct, including without limitation damages for past, present, and future medical expenses, other out of pocket expenses, lost time and interest, lost future earnings, and all other physical and non-physical damages suffered, including any future damages likely to be incurred by Plaintiffs and the Classes;

D.      Awarding Plaintiffs and the Classes their reasonable litigation expenses and attorneys' fees;

E.      Awarding Plaintiffs and the Classes pre- and post-judgment interest, to the extent allowable;

F.      Entering injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and the Classes; and

G.      Awarding such other and further relief as equity and justice may require.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all issues so triable.

Respectfully submitted,

**JEFFREY JONES**, **BRIAN MILNE, PATRICK JOHNSON, RANDALL SCOTT, EDWARD WILKINS, III, and JOHN HARRIS II,** individually and on behalf of all similarly situated individuals,

Dated: October 30, 2018

By: /s/ Benjamin H. Richman

*One of Plaintiffs' Attorneys*

Jay Edelson
jedelson@edelson.com
Benjamin H. Richman
brichman@edelson.com

Daniel Schneider
dschneider@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian
rbalabanian@edelson.com
EDELSON PC
123 Townsend Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

George Parker Young*
gpy@cwylaw.com
Vincent P. Circelli*
vinny@cwylaw.com
Kelli Walter*
kelli@cwylaw.com
CIRCELLI WALTER & YOUNG, PLLC
500 East 4th Street, Suite 250
Fort Worth, Texas 76102
Tel: 817.697.4942

*Attorneys for Plaintiff*

*\*Pro hac vice* admission to be sought.